UNITED STATES DISTRICT COURT                    c
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| PAMELA ANN COURVILLE, Plaintiff | CIVIL ACTION NO. 2:17-CV-01325 |
| VERSUS | JUDGE JAMES |
| U.S. COMMISSIONER SOCIAL SECURITY ADMINISTRATION, Defendant | MAGISTRATE JUDGE PEREZ-MONTES |

## REPORT AND RECOMMENDATION

Before the Court is Pamela Ann Courville's ("Courville's") appeal of the denial of Social Security Income ("SSI") by the Commissioner of Social Security (the "Commissioner"). Because substantial evidence supports the ALJ's finding that Courville is not disabled, the Commissioner's decision should be AFFIRMED and Courville's appeal should be DENIED and DISMISSED WITH PREJUDICE.

## I.    Background.

Courville filed an application for SSI on February 24, 2015.[1] (Doc. 13-1, pp. 105-111). Courville alleged a disability onset date of October 6, 2005, due to insomnia and peripheral neuropathy. (Doc. 13-1, pp. 105-111, 131). Courville's claim was initially denied by the Social Security Administration ("SSA") on September 3, 2015. (Doc. 13-1, pp. 45-58).

---

[1] The application shows a filing date of March 19, 2015. (Doc. 13-1, p. 105). However, the ALJ's decision gives a filing date of February 25, 2015. (Doc. 13-1, p. 13).

A video hearing was held before an administrative law judge ("ALJ") on July 27, 2016.[2] (Doc. 13-1, pp. 13-44). Courville appeared with Charles E. Smith, a vocational expert ("VE"), and her attorney Guy O. Mitchell. (Doc. 13-1, p. 28-44). The ALJ denied Courville's claim on August 31, 2016. (Doc. 13-1, pp. 13-22). The ALJ determined that Courville was not disabled under the Social Security Act (the "Act"), finding that Courville does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months. (Doc. 13-1, p. 18-22). On August 17, 2017, the Appeals Council denied Courville's request for review, and the ALJ's August 31, 2016 decision became the final decision of the Commissioner of Social Security (the "Commissioner"). (Doc. 13-1, pp. 4-7).

Proceeding *in forma pauperis*, Courville filed this appeal for judicial review of the Commissioner's final decision. (Doc. 1). Courville asserts there is no substantial evidence to uphold the decision of either the ALJ or the Appeals Council. (Doc. 1). Courville alternatively asserts that this matter should be remanded for a hearing, since further medical evidence is available and will prove Courville's disability. (Doc. 1). Courville's argues in her brief that the ALJ's decision is not supported by substantial evidence as the totality of the medical evidence supports a finding of disability. (Doc. 15). Courville contends the ALJ confirmed the record contains the opinion from a non-treating doctor, which supports the residual functional capacity ("RFC") reached in this decision and consistent with the credible medical evidence

---

[2] Courville appeared in Lake Charles, Louisiana, and the ALJ presided over the hearing from Alexandria, Louisiana. (Doc. 13-1, p. 16).

2

but found Courville's complaints were not consistent with the medical records. (Doc. 15).

The Commissioner responded. (Doc. 16).  Courville's appeal is now before the Court for disposition.

### A.     Administrative Hearing

At the July 27, 2016 administrative hearing, Courville testified her date of birth is January 4, 1971.  (Doc. 13-1, p. 32).  Courville has a high school education and no vocational or work-related training after high school. (Doc. 13-1, p. 32).  She is not currently working.  (Doc. 13-1, p. 32).  Courville last worked about twelve years ago for about 25 hours for a Nascar promotion.  (Doc. 13-1, p. 32).  Otherwise, she had no other work in the last 15 years, from 2001 to present. (Doc. 13-1, p. 32).  The ALJ noted for the VE that he found no past relevant work based on Courville's testimony or earning records.  (Doc. 13-1, p. 32-33).

Courville testified she can pay her bills through the child support she receives and some monetary assistance from friends. (Doc. 13-1, p. 33).  She has a driver's license, and although she gets sleepy, manages to drive. (Doc. 13-1, p. 33).  She lives in a mobile home with her 15-year old and 16-year old children.  (Doc. 13-1, p. 33). She testified she can keep up with household chores and has no difficulty performing those chores.  (Doc. 13-1, p. 33).  Courville stated that, if she is home, she can take a nap, take breaks, and use heating pads for her neuropathy. (Doc. 13-1, p. 33-34). She stated that, on an average day, she catches up on rest, manages her sons, and manages household chores, including feeding animals.  (Doc. 13-1, p. 34).  When her

3

kids are not able to, she takes care of the animals, including cats, a dog, and a couple of horses. (Doc. 13-1, p. 34). She attends her kids' school and sporting events. (Doc. 13-1, p. 34). Courville stated that she, however, stays tired and groggy. (Doc. 13-1, p. 34). She testified she is able to do the grocery shopping and other types of shopping. (Doc. 13-1, p. 34).

Upon questioning by her attorney, Courville stated she was diagnosed with peripheral neuropathy. (Doc. 13-1, p. 35). She testified she cannot remember things, so she usually writes them down. (Doc. 13-1, p. 35). Courville stated her lower legs, from the knees down, have piercing pain, numbness, coldness, tingling, and feel like they are not there. (Doc. 13-1, p. 35). Courville stated she seeks relief through heating pads and massage. (Doc. 13-1, p. 35). Courville testified that her chronic insomnia is the worst, having dealt with it since age five. (Doc. 13-1, p. 35). She described her side effects to include lack of alertness, impaired memory, extreme forgetfulness, anxiety, depression, irritability, problems concentrating, lack of focus, cloudy judgment, absentness, drowsiness, feeling lost, slow reaction, and confusion. (Doc. 13-1, p. 35). Courville stated she deals with this daily. (Doc. 13-1, p. 35).

Courville testified that she uses Ambien to sleep, which does not help her side effects. (Doc. 13-1, pp. 35-36). Being home allows her to lie down and nap when she feels down. (Doc. 13-1, p. 36). Courville stated this occurs daily. (Doc. 13-1, p. 36). When she is out and about, she must go home because she is tired. (Doc. 13-1, p. 36). Courville described her neuropathy as tingling and coldness in her legs. (Doc. 13-1, p. 36). When topped with the side effects of the insomnia, she has bouts of depression.

(Doc. 13-1, p. 36). She stated she sees Dr. Warshaw in Alexandria for the depression. (Doc. 13-1, pp. 36-37). She testified she also has seen Dr. David, Dr. Michael Dole, and Dr. Hidalgo. (Doc. 13-1, p. 37). Courville read descriptions of chronic insomnia and related symptoms from research she conducted, which she testified apply to her. (Doc. 13-1, p. 38). Courville stated her chronic insomnia affects her ability to think, remember, and process information. (Doc. 13-1, p. 38). She testified she is moody and more likely to have conflicts with others. (Doc. 13-1, pp. 38-39). She stated sleep aids do more harm than good, as the side effects are devastating. (Doc. 13-1, p. 39). However, Courville feels that it is better than no sleep at all. (Doc. 13-1, p. 39).

Courville testified that, with her peripheral neuropathy, she develops pain after standing or sitting too long. (Doc. 13-1, p. 39). She feels she has severe limitations with being able to walk, stand, and sit. (Doc. 13-1, p. 39). She broke both legs when she was a child but does not know if that is why she has this problem. (Doc. 13-1, p. 39). She currently takes Xanax, Klonopin, Ambien, Cyclobenzaprine, Ibuprofen, and Excedrin. (Doc. 13-1, p. 39).

The ALJ followed-up by asking Courville how much she can lift and carry in terms of pounds. (Doc. 13-1, p. 40). She testified she can lift 20 pounds. (Doc. 13-1, p. 40). Courville testified that it varies – sometimes five minutes, sometimes 30 minutes – as to how long she can stand or walk before she must sit down for a break. (Doc. 13-1, p. 40). She testified she can sit for about ten minutes before she has to get up and take a break. (Doc. 13-1, p. 40). Courville stated she does not really have problems getting along with others. (Doc. 13-1, p. 40).

Because the ALJ found no past relevant work, the ALJ moved on to his first hypothetical question. (Doc. 13-1, p. 42). The ALJ asked the VE to assume that a hypothetical individual with the same age, education, and with no past relevant work would be limited to light exertional level work with occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; limited to simple routine or repetitive work and limited to simple work-related decisions. (Doc. 13-1, p. 42). The ALJ asked the VE, under that hypothetical, whether there would be any light work available. (Doc. 13-1, p. 42).

Regarding the first hypothetical, the VE testified there was light work available. (Doc. 13-1, p. 42). The VE testified that the jobs available include a cafeteria attendant, light physical in demand, SVP of 2, unskilled, DOT number 311.677-010 (268,381 jobs in the national economy, Louisiana supporting 3,773). (Doc. 13-1, p. 42). The VE further testified the individual could work as a price marker, light physical in demand, SVP of 2, unskilled, DOT number 209.587-034 (332,600 jobs in the national economy, Louisiana supporting 4,068). (Doc. 13-1, p. 42).

The ALJ asked the VE to further assume that an individual with all the same limitations that needs at least two additional breaks during the work day, each a 15-minute duration; needs to be absent from work at least two days per month; and needs to be off task at least 20 percent of the work day. (Doc. 13-1, p. 42). With those additional limitations, the VE testified there would be no available work in the

national economy.  (Doc. 13-1, p. 42).  The VE further testified that each of the three additional limitations would independently preclude employment. (Doc. 13-1, p. 43). The ALJ also asked the VE whether his testimony is consistent with the DOT requirements. (Doc. 13-1, p. 43).  The VE testified that all of his testimony is consistent with the DOT except his opinion rendered regarding the number breaks, time off task behavior, and absenteeism.  (Doc. 13-1, p. 43).  The VE testified his opinion was given based on knowledge of what employers will accept within a work setting as well as research and review from peers in the field.  (Doc. 13-1, p. 43).

### B.    ALJ's Findings

To determine disability, the ALJ applied the five-step sequential process outlined in 20 C.F.R. § 404.1520(a) and 416.920.  The sequential process required the ALJ to determine whether Courville: (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in Appendix 1; (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means the claimant bears the burden of

proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

The ALJ found that Courville has not engaged in substantial gainful activity since February 24, 2015, which he stated was the application date. (Doc. 13-1, p. 18). In step two of the sequential evaluation, the ALJ determined Courville has the medically determinable impairments of peripheral neuropathy and affective disorder. (Doc. 13-1, p. 18). However, the ALJ concluded Courville does not a medically determinable impairment that is "severe" or a combination of impairments that is "severe." (Doc. 13-1, p. 18). Specifically, the ALJ found that Courville does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, Courville does not have a severe impairment or combination of impairments. (Doc. 13-1, p. 18). The ALJ concluded that Courville has not been under a disability, as defined in the Act, since February 24, 2015, the date the application was filed. (Doc. 13-1, pp. 22).

## II.    Law and Analysis.

### A.    Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to

be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

**B.    Substantial evidence supports the ALJ's finding that there were no severe impairments.**

The Commissioner has issued regulations that define a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  See 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521.  Basic work activities include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

20 C.F.R. § 416.922(b)(1)-(6).

However, the Fifth Circuit holds that an impairment "can be considered as not severe only if it is a slight abnormality [having] such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985).  "This second step requires the claimant to make a *de minimis* showing."  Salmond v. Berryhill, 892 F.2d 812, 817 (5th Cir. 2018) (citing Anthony v. Sullivan, 954 F.2d 289, 293 n. 5 (5th Cir. 1992) (noting the Fifth Circuit has not gone so far as to hold that the severity regulation is facially invalid and that the Secretary may require the claimant to make a *de minimis* showing that her impairment is severe enough to interfere with her ability to work)).

Subsequent to its decision in <u>Stone</u>, the Fifth Circuit published a decision holding that if substantial evidence supports a non-severity finding, any error by the ALJ in not following the standard set out in <u>Stone</u> does not automatically require remand unless the claimant is actually harmed by the error. <u>Taylor v. Astrue</u>, 706 F.3d 600, 603 (5th Cir. 2012).  In <u>Taylor</u>, the claimant complained of chronic pain but the medical records did not corroborate his complaints.  <u>Id.</u>  His MRI was normal, his EEG was normal, and his neurophysiological studies were unremarkable. <u>Id.</u> Because there were no objective medical findings to corroborate the claimant's subjective complaints, there was a sound basis for the ALJ to conclude that the claimant was not disabled. <u>Id.</u>  The court in <u>Taylor</u> found substantial evidence supported the ALJ's finding that the claimant's mental health claims were not severe enough to prevent him from holding substantial gainful employment. <u>Id.</u>

Courville asserts that the totality of the medical evidence supports a finding of disability. (Doc. 14).  Courville notes that the ALJ confirmed that the record contains a non-treating doctor's opinion which supports his finding of RFC and is consistent with the credible medical evidence.[3]  (Doc. 15).  Yet, Courville asserts, the ALJ found that Courville's complaints were not consistent with the medical evidence. (Doc. 15). Courville contends that the medical records support her complaints. (Doc. 15). Courville claims there is no question she suffered from bilateral paresthesia, with an overlay of severe depression and insomnia, which made it impossible for her to perform any gainful activities.  (Doc. 15).

---

[3] The only non-treating doctor's opinion found in the record is the consultative examiner's opinion which the ALJ afforded great weight.

The Commissioner states that Courville's assertion that the medical evidence supports her claims of disability is incorrect. (Doc. 16). Rather, the Commissioner argues, Courville's medical examinations have shown the absence of functional limitations, and Courville has identified no medical evidence showing she met her burden of demonstrating the presence of clinically observable functional impairments. (Doc. 16).

Review of the record as a whole shows that Courville has not established that she suffers more than a minimal effect on her functionality. The burden of proof is on the claimant to prove that she suffers from a disability that qualifies her for benefits. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Courville is required to show that she was so functionally impaired by her impairments that she was precluded from engaging in substantial gainful activity. See Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983) ("The mere presence of some impairment is not disabling per se. A claimant must show that she was so functionally impaired by her back trouble that she was precluded from engaging in any substantial gainful activity.").

Here, the ALJ cited the language of the current regulation, but also included the "slight abnormality" definition of the regulation adopted by the Fifth Circuit. (Doc. 13-1, p. 17). The ALJ found that Courville had medically determinable impairments of peripheral neuropathy and affective disorder. (Doc. 13-1, p. 18). However, because the ALJ found that Courville does not have a "severe" impairment or combination of impairments that is "severe," the ALJ found Courville was not disabled at step two of the sequential evaluation. (Doc. 13-1, p. 18). The ALJ did not

proceed through the remaining steps.  (Doc. 13-1, p. 18).  In determining that Courville's impairments were not severe, the ALJ noted he considered all Courville's symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on 20 C.F.R. 416.929 and SSR 96-4p.  (Doc. 13-1, p. 19).  He also considered opinion evidence under 20 C.F.R. 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.  (Doc. 13-1, p. 19).

The ALJ followed a two-step process to determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce Courville's pain or symptoms, and to evaluate the intensity, persistence, and limiting effects of her symptoms to determine the extent they limit her functioning. (Doc. 13-1, p. 19).

The ALJ noted that Courville's testimony indicated that she lives with two of her children, ages 15 and 16; that she is able to keep up with the chores in the house, feed animals – which includes horses; has no problems attending her children's sporting events; is able to grocery shop; and drives a vehicle. (Doc. 13-1, p. 19).  The ALJ referred to Courville's testimony that her primary problems are in her lower legs due to peripheral neuropathy causing piercing pain in her legs. (Doc. 13-1, p. 19).  The ALJ further stated Courville testified she is disabled in combination with chronic insomnia and depression.  (Doc. 13-1, p. 19).  He also stated she reported memory problems and is able to lift up to 20 pounds. (Doc. 13-1, p. 19).  The ALJ found that Courville's medically determinable impairments could reasonably be expected to produce the alleged symptoms.  (Doc. 13-1, p. 19).  But the ALJ determined Courville's

statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence. (Doc. 13-1, p. 19).  The ALJ discussed the medical evidence of record in his explaining his decision.  (Doc. 13-1, pp. 19-22).

The record shows that Courville treated with Dr. Michael Dole ("Dr. Dole") on March 11, 2008 for numbness in her feet and calves. (Doc. 13-1, p. 189).  Dr. Dole noted she reported a two to three-year history of paresthesia in both feet.  (Doc. 13-1, p. 189).  She reported it does not seem to be getting progressively worse. (Doc. 13-1, p. 189).  She also reported occasional back pain, with some relief from heating pads. (Doc. 13-1, p. 189).  She reported an active lifestyle, with five children. (Doc. 13-1, p. 189).  She also reported regular exercise, including jogging. (Doc. 13-1, p. 189).  On physical examination, she had no tenderness in her back and negative straight leg raise. (Doc. 13-1, p. 189).  Her active and passive range of motion in both the upper and lower extremities were within normal limits, motor strength was 5/5, and sensation was intact to light touch in both upper and lower extremities. (Doc. 13-1, p. 190).  Gait and station were normal. (Doc. 13-1, p. 190).  Dr. Dole performed an electromyogram ("EMG") and nerve conduction study ("NCS") on the same date, which was mostly within normal limits. (Doc. 13-1, p. 191-192). Dr. Dole's impression was mild generalized peripheral neuropathy of unclear etiology, with no electromyographic evidence of radiculopathy, myopathy, or plexopathy in either lower extremity. (Doc. 13-1, p. 190).

Courville treated with Dr. Gonzalo I. Hidalgo ("Dr. Hidalgo") at the NeuroMedical Clinic of CENLA on November 4, 2013 for complaints of leg numbness. (Doc. 13-1, p. 196). She reported burning pain, numbness, tingling, and weakness, but no history of lower back pain. (Doc. 13-1, p. 196). Courville reported her symptoms have been present the last 15 years. (Doc. 13-1, p. 196). Courville reported her legs feel cold, stating it has been worsening. (Doc. 13-1, p. 196). However, Dr. Hidalgo's physical exam of Courville revealed a normal exam, with normal gait and normal overall sensory and motor strength. (Doc. 13-1, p. 198). Dr. Hidalgo found that, as to Courville's history of peripheral neuropathy, no specific findings were seen clinically. (Doc. 13-1, p. 198). He recommended an EMG/NCS of the lower extremities, and prescribed Neurontin as tolerated and Zanaflex at night. (Doc. 13-1, p. 199).

She returned for an EMG/NCS on December 2, 2013, for complaints of leg pain and leg numbness. (Doc. 13-1, p. 200). Courville was noted as unchanged compared to previous visits. (Doc. 13-1, p. 201). Dr. Hidalgo found that the EMG/NCS was basically unremarkable. (Doc. 13-1, p. 202). He increased her Neurontin to 300 milligrams and added Silenor for insomnia. (Doc. 13-1, p. 202). Dr. Hidalgo performed a skin biopsy on February 5, 2014, which showed no normal epidermal nerve fiber density and no evidence of vasculitis or other histological abnormalities. (Doc. 13-1, p. 203).

On March 12, 2014, Courville saw Dr. Hidalgo for complaints of continued numbness and tingling in her legs. (Doc. 13-1, p. 208). She also complained of

paresthesia and frequent headaches. (Doc. 13-1, p. 209). Physical exam remained normal, unchanged compared to previous visits, with normal gait and normal gait in the upper and lower extremities. (Doc. 13-1, p. 209). Dr. Hidalgo noted the EMG/NCS of the bilateral lower extremities and skin biopsy were both unremarkable and that Courville was unable to take the Neurontin due to side-effects. (Doc. 13-1, p. 210). Dr. Hidalgo also noted Courville continues to report paresthesia to the bilateral lower extremities from the knees down, but all tests have been unremarkable. (Doc. 13-1, p. 210). Dr. Hidalgo recommended a lumbar spine MRI to further clarify her diagnosis. (Doc. 13-1, p. 210). An April 1, 2014 MRI of the lumbar spine was essentially normal. (Doc. 13-1, p. 211).

On April 25, 2014, Courville treated with Dr. Thomas Davis ("Dr. Davis") requesting an Ambien refill, and complaining her neuropathy is worse when stressed. (Doc. 13-1, p. 228). She had a normal general examination and was assessed with neuropathy in other diseases classified elsewhere, insomnia, and rhinitis. (Doc. 13-1, p. 228). Dr. Davis started Courville on Cymbalta 30 milligrams for neuropathy and refilled her Ambien 10 milligrams. (Doc. 13-1, p. 228).

On June 27, 2014, Courville reported to Dr. Davis that she started Cymbalta and cannot take it because it makes her "feel like she's dying" and "she can't move." (Doc. 13-1, p. 226). She also requested pain medication for her chronic migraines and "neuropathy attacks," and stated she "needs a letter stating she has neuropathy for DCFS." (Doc. 13-1, p. 226). Her general physical examination was unremarkable. (Doc. 13-1, p. 226). Courville was assessed with neuropathy in other diseases

classified elsewhere, insomnia, and rhinitis.   (Doc. 13-1, p. 226).   Dr. Davis discontinued her Cymbalta prescription, added Doxepin Hydrochloride 10 milligrams for neuropathy, and refilled her Ambien 10 milligrams prescription for insomnia. (Doc. 13-1, p. 226).  She was referred to Dr. Hidalgo for peripheral neuropathy.  (Doc. 13-1, p. 227).

On July 30, 2014, Courville returned to Dr. Davis complaining she does not know why Dr. Davis wants her to see Dr. Hidalgo and just "need[s] a Barbiturate" and "is trying to get off [A]mbien."  (Doc. 13-1, p. 224).   Dr. Davis discussed the need for neurology follow-up with Courville and assessed her with neuropathy in other diseases classified elsewhere, insomnia, rhinitis, and low back pain. (Doc. 13-1, p. 224).  Dr. Davis stopped prescriptions of Cymbalta and Doxepin Hydrochloride and added Gabapentin 100 milligrams for neuropathy, and refilled Ambien 10 milligrams for insomnia.  (Doc. 13-1, p. 224).   She was also counseled on diet, exercise, and calcium supplementation, encouraged to see Dr. Hidalgo, and decide on whether to follow-up with Dr. Dole. (Doc. 13-1, p. 224).

She returned to Dr. Hidalgo on August 5, 2014, with continued complaints of leg numbness, pain, and coldness. (Doc. 13-1, p. 212).  She reported that heat helps the pain. (Doc. 13-1, p. 212).  Dr. Hidalgo opined that Courville remains with similar symptoms, with "no clear evidence of neuropathy." (Doc. 13-1, p. 214).  He referred her to a rheumatologist and added Zanaflex.  (Doc. 13-1, p. 214).

On September 22, 2014, Courville treated with Dr. Davis for complaints of low back pain, radiation of pain into the buttock, but denied tingling or numbness. (Doc.

13-1, p. 220).  Physical exam of the lower back revealed tenderness on the sacroiliac joints, right greater than left, but was otherwise a normal exam.  (Doc. 13-1, p. 220).  She was diagnosed with a backache, unspecified, costochondritis, muscle spasm, and contusion of trunk.  (Doc. 13-1, p. 220).  Dr. Davis prescribed ibuprofen 600 milligrams, as needed, heating pad, stretches, and cyclobenzaprine 10 milligram. (Doc. 13-1, p. 221).

On August 19, 2015, Dr. Vanchi Vu ("Dr. Vu") performed a comprehensive physical examination of Courville.  (Doc. 13-1, p. 247).  Courville reported she had a history of depression diagnosed when she was going through separation from her ex-husband in 2011 but was asymptomatic. (Doc. 13-1, p. 247).  She reported chronic insomnia since she was young, noting she is on Ambien 10 milligrams.  (Doc. 13-1, p. 247).  She reported she is able to sleep well with the medication. (Doc. 13-1, p. 247).  She also stated her depression is controlled when she is able to sleep.  (Doc. 13-1, p. 247).  She denied teary depression with suicidal thoughts, withdraw, anhedonia, and lack of sleep. (Doc.13-1, p. 247).  Courville reported to Dr. Vu that she has peripheral neuropathy with cold sensation in both feet. (Doc. 13-1, p. 247).  She noted her associated symptoms are dull to sharp pain in both knees, radiating down to her feet, with tingling and numbness, somewhat alleviated with heat and massage. (Doc. 13-1, p. 247).  Dr. Vu noted the April 1, 2014 lumbar spine MRI showed a normal spine. (Doc. 13-1, p. 247).  Courville denied loss of sensation, swelling, and weakness in her legs. (Doc. 13-1, p. 247). A mini-mental state examination ("MMSE") revealed a

maximum score of 30, showing no cognitive impairments or abnormalities. (Doc. 13-1, p. 248).

Dr. Vu's functional findings were that Courville was able to bathe herself, was independent with dressing, able to feed herself, and was independent in toilet and transfer independent. (Doc. 13-1, p. 248). Physical exam showed Courville ambulated without assistance, was able to step up and down the exam table without assistance. (Doc. 13-1, p. 248). Courville's musculoskeletal exam was normal. (Doc. 13-1, p. 249). Dr. Vu found her gait was normal and she was able to rise from a sitting position, tandem walk without assistance, bend and squat without difficulty, and was able to walk on her tip toes and heels. (Doc. 13-1, p. 249). Dr. Vu found her grip strength was 5/5 with adequate fine motor movements, dexterity, and she was able to grasp objects bilaterally. (Doc. 13-1, p. 249). Dr. Vu also observed that Courville was alert and oriented to time, place, and situation, did not appear depressed or anxious, and was able to communicate with no deficits. (Doc. 13-1, p. 249). He also found her recent and remote memory intact, and that Courville had good insight and cognitive function. (Doc. 13-1, p. 249).

Dr. Vu opined that, subjectively, Courville complains of depression, insomnia, and peripheral neuropathy. (Doc. 13-1, p. 251). However, objectively, Dr. Vu observed Courville to have no evidence of appreciable spasms, atrophy, or neurological deficits. (Doc. 13-1, p. 251). Dr. Vu found that Courville's grip strength, dexterity, grasping ability, gait, station, bending, squatting, range of motion, mental status, and cognitive function are without significant deficits. (Doc. 13-1, p. 251).

19

Based on his evaluation and despite Courville's impairments, Dr. Vu opined that Courville was able to perform work-related activities such as lifting, carrying, standing, walking, sitting, pushing, pulling, and traveling for a full work day without limitations. (Doc. 13-1, p. 251). Dr. Vu stated Courville should also be able to hold a conversation, remember and follow instructions, as well as carry them out without restrictions. (Doc. 13-1, p. 251). In his decision, the ALJ afforded "great weight" to Dr. Vu's opinion. (Doc. 13-1, p. 21). The ALJ stated he found Dr. Vu's opinion is consistent with the medical evidence of record showing no more than minimal conservative treatment and no objective evidence of musculoskeletal dysfunction. (Doc. 13-1, p. 21).

The ALJ took note of a diagnosis of depression on February 6, 2015. (Doc. 13-1, p. 21). Courville treated with Dr. Davis for complaints of nasal congestion, noting that she is under a lot of stress with children and her ill father. (Doc. 13-1, p. 216). She stated, "I feel very depressed and I frequently cry." (Doc. 13-1, p. 216). She also reported she lost interest in her usual activities. (Doc. 13-1, p. 216). She was diagnosed with upper respiratory infection, urinary tract infection, and a major depression, not otherwise specified. (Doc. 13-1, p. 216-217). She was prescribed Sertraline Hydrochloride, 25 milligrams, for depression. (Doc. 13-1, p. 216-217). The ALJ stated there was no other record of mental health treatment. (Doc. 13-1, p. 21). The ALJ found that this evidence suggested Courville is not impaired with symptoms of depression that are more than mild in nature. (Doc. 13-1, p. 21). Additionally, the

ALJ noted that Courville reported to Dr. Vu that her depression was currently asymptomatic.  (Doc. 13-1, p. 21).

The ALJ also addressed the record evidence that included Courville's treatment with Dr. L.M. Warshaw of Alexandria Otolaryngology Associates for chief complaints of sinus problems from March 12, 2015 through June 30, 2016, including a March 27, 2015 sinus turbinate reduction surgery.  (Doc. 13-1, p. 21, pp. 255-272). Dr. Warshaw's records note past medical history of anxiety disorder, depression, insomnia, and migraine headaches. (Doc. 13-1, pp. 259-272).  On June 30, 2016, she returned with complaints of insomnia and described daytime sleepiness, depression, irritability, insomnia, loud breathing, and restless sleep. (Doc. 13-1, p. 255).  She reported her problem first began one month ago. (Doc. 13-1, p. 255).  Dr. Warshaw noted she appeared anxious and depressed, but was oriented to person, place, and time and noted no acute distress. (Doc. 13-1, p. 256).  He diagnosed her with insomnia and prescribed a thirty-day supply of Ambien 10 milligrams, a ten-day supply of Sonata 10 milligrams, and a ninety-day supply of Xanax 0.25 milligrams. (Doc. 13-1, p. 256).

In discussing the medical evidence, the ALJ found that no health care provider who examined Courville reported that she was unable to work.  (Doc. 13-1, p. 21). The ALJ found that the evidence as a whole does not establish that Courville could not perform the full range of work. (Doc. 13-1, p. 21).  The ALJ further noted that although Courville received treatment for peripheral neuropathy, the treatment has been conservative and routine. (Doc. 13-1, p. 22).  The ALJ stated that Courville

alleges to be in extreme constant pain, but she has not had the treatment one would expect of a completely disabled person, such as intensive physical therapy, steroid injections, nerve blocks, and surgeries. (Doc. 13-1, p. 22).  The ALJ noted that Courville's EMG/NCS revealed normal findings, which undermines her allegations that she is in extreme pain and incapable of performing any work.  He found that the opinion from a non-treating doctor supports the RFC reached in his decision and is wholly consistent with the credible medical evidence of record. (Doc. 13-1, p. 22).  The ALJ further determined the credible medical evidence of record and at the hearing showed that Courville had none of the general indices of people who suffer from chronic pain such as atrophy, impairment of general nutrition, signs of premature aging, and poor general health. (Doc. 13-1, p. 22).   The ALJ concluded that Courville does not have a severe impairment or combination of impairments, summing up that Courville's physical and mental impairments, considered singly and in combination, do not significantly limit her ability to perform basic work activities.  (Doc. 13-1, p. 22).

The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ, who has had an opportunity to observe whether the person seems to be disabled.  See Loya v. Heckler, 707 F.2d 211, 215 (5th Cir. 1983) (citing Laffoon v. Califano, 558 F.2d 253, 254-55 (5th Cir. 1977)); see also Dominguez v. Astrue, 286 Fed. Appx. 182, 186 (5th Cir. 2008).  A factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence.  Dominguez, 286 Fed. Appx. at 186 (citing Villa v.

Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990)).  Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints.  See Falco, 27 F.3d at 163-64.  The record shows that, subjectively, Courville complained of impairments of peripheral neuropathy, but there were no objective findings.  Additionally, the medical record shows no functional limitations. The ALJ went through the evidence of record articulating reasons for rejecting Courville's testimony regarding her pain and symptoms, as not consistent with the medical evidence of record.  The Court finds that substantial evidence supports the ALJ's finding that Courville is not disabled.

The Court also rejects Courville's claim that upon a finding of substantial evidence this matter should be remanded for consideration of additional medical evidence to establish her disability.  Remand under § 405(g) requires Courville to show there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g).  Here, Courville has failed to make any such showing.

III.    **Conclusion**

Because the ALJ's finding that Courville is not disabled is based on substantial evidence in the record,

IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Courville's appeal be DENIED and DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __8th__ day of April, 2019.

Joseph H.L. Perez-Montes
United States Magistrate Judge